This time we'll hear Heller v. Bedford Central School District. Good morning, how are you? Good morning, Your Honors. May it please the Court. This is an appeal from a grant of a motion to dismiss. That grant should be reversed. The plaintiff does state plausible claims with respect to each of the appellees, and no affirmative defenses warrant dismissal. This is a First Amendment claim. The appellee, the appellant rather, spoke on I.M. to a personal friend. The appellees, somehow or not sure how, learned of the speech, and then we believe, and the complaint we believe plausibly explains in great detail, intended to punish the plaintiff for his protected speech. They learned of it through the FBI. What? They learned of it through the FBI. The record is not clear how they learned of it, respectfully. When you say through the FBI, the FBI wasn't a party to the conversation, so we're not clear how they learned about it. Well, we don't know what conversations the FBI is party to. I agree with you. It is the FBI that contacted the chief of police in the town. Understood, but we don't know how the FBI learned of the conversation. That's my point. In any event, the speech is not here a true threat under the Watt case. The speech is about matters of public importance under Garcetti and Snyder, and while it's private speech, it's constitutionally protected under Rankin v. McPherson. With regard to the Pickering defense, it's plain that this is premature on the pleadings. Meltzer set forth the standards for the application and situations of a Pickering defense. Here, they're certainly insufficient, showing that this private speech, delivered in the form that it was, would ever have been known to school authorities. That's certainly comparable to Meltzer's notorious behavior. The speech had nothing to do with the discharge of job duties, whereas Meltzer's speech was about him being a pedophile and a teacher and his proclivity not to want to report sexual misconduct of others because he didn't believe it was sexual misconduct. With regard to qualified immunity, as Savino indicates and many other cases in this court, the grant on qualified immunity is clearly premature where you have fact-intensive issues with respect to intent, which you have here. With respect to Monell, you have a delegation to the principal decision-makers, Ryan on the one hand and the school superintendent, Hackman, on the other, and those delegations are sufficient under Pembauer to make out liability. With regard to the Fourth and Fourteenth Amendments, and there's a connection between the two, as our briefs explain, Ryan did seize on 118.13 the plaintiff without probable causes defined by the mental hygiene law, which is specific in its definitions under 901, 939, 940, and 941. Dr. Kenker, as the complaint explains, violated substantive due process as defined in this court's decisions in Rodriguez and Olivier since the confinement was without the standard, a reasonable medical standard, the level of threat manifested is fought insufficient under the provisions of mental hygiene law. Can I ask a question about public concern? Correct me if I'm understanding where this speech takes place, but this is speech on an on-site Scrabble. You can play Scrabble online, and then you can have side messaging with the person you're playing Scrabble with. Would that speech, does the record tell us whether that speech would be part of the Scrabble website? Do we know that? The record doesn't tell us, but it would not. It would be private speech as between the two individuals engaged, that is, Ms. O'Connor on the one hand, the media, and our client, Mr. Heller, on the other hand. Meaning the people that run the website would not have access to it. That's my belief. So this is private speech between two people, comes into the possession of the school board, and is a teacher in the school, and expresses things about homicidal impulses and being angry. Why is this speech, which the district court characterized as delusional, on a matter of public concern? The speech is about the economic demise of the United States, about the gentleman's views concerning matters of public importance and public policy. The views can be characterized however one wants, but it's clear to me that the district court engages in substantive analysis of the speech acts to come to a conclusion as to whether they are protected acts or not. I think that totally flies in the face of Snyder and many other decisions which say that's not appropriate. These are views he's expressing about the nation, and it's clear if you read them, and they're cited extensively in the joint appendix of pages 443 through 524. If you look at the speech in its totality, it's clear that there's an interest in commenting upon matters of public importance. With regard to homicidal notions, people use matters of speech every day. I'd like to kill someone. That has absolutely nothing to do with disqualifying the speech, in my view, from First Amendment protection when contextually understood. Nothing. Why does the fact, if it is the fact, that the speech is on a matter of public importance mean that it's not delusional? Well, I think that one's judgment about whether it's delusional or not delusional is your judgment. I'm not arguing with the judgment. I don't understand what constitutional virtue that judgment has. That's my point. I think that the speech that's protected in Snyder, in which people are expressing views that the soldiers should be killed, the soldiers are demons, I think that's delusional. Much more delusional, much more public, much more volatile than this speech. It's constitutionally protected. So the issue of your characterization, and I don't mean this personally, any court's characterization of the speech as delusional, we have to be very careful about that. You see, if he was a communist, and you viewed his views as a communist, as delusional, in other words, we don't believe a state will ever guarantee people a beneficence as communists believe. We think that's a delusional way of thinking. And we have a hundred years of experience now, which says it's delusional. And we're capitalists. That has nothing to do with his right to engage in that speech privately. And under Pickering, there has to be some demonstration. Are you saying that there will never be delusional speech? I'm saying it's all delusional. Your speech and my speech, someone always could view our speech as delusional. Are you saying that, for example, some of his speech here is about how there's extraterrestrial control of human beings? Scientologists believe that. Pardon? Scientologists believe that. It's part of their doctrine. They're allowed to speak. And their speech is protected constitutionally. And the government can't say, you're a Scientologist and you believe in aliens, therefore you can't teach. Mr. Heller has taught for ten years in this school system. There's not one complaint about Mr. Heller. His evaluations are superb. There's no showing that any of this morphed or any way affected Mr. Heller's performance. So when you look at the Meltzer case, the pedophile case, and you have an individual who believes that it's okay to engage in sexual contact with young children and says he would not report another person doing that, a school district can make a reasonable argument that having a person with that mentality, forgetting about whether he's ever even expressed that mentality, is some sort of a threat. You can't say the same thing about my client. It's impossible. Because if you have a litmus test, we're going back to the 1950s, the Supreme Court got rid of those litmus tests in public education. And the fact that he has views that you may, Your Honor, respectfully think are delusional, or I think is delusional, has no constitutional import. His speech is protected. Thank you. You're very welcome. You deserve a rebuttal. You deserve it. Good morning, Your Honors. My name is Richard Cass. I represent the Bedford Central School District. From the school district's point of view, the key issue here is causality. There is no causal chain in the complaint, even if you read the complaint in the most favorable way to Mr. Heller. There's no way to make a reasonable inference that Mr. Heller's speech, whether it's delusional or protected or whatever, between Mr. Heller's speech and his discharge. Too many things happen in between. There were too many intervening events that break that causal chain. So let's look at what happened. January 8th, the school district finds out that he was making these statements. The district didn't take any action at that point. He remained employed. He was still teaching for ten more days. And even after ten more days, the district didn't do anything. What happened is that the police followed him home from school, found that he was going to a gun store. They stopped him. They had a conversation. There's a dispute what happened there, but he was committed to a mental institution after that for almost two weeks. The district had nothing at all to do with any of that. The district still took no action while he was in the mental institution. After he was in the mental institution, the district gets a one-sentence doctor note saying, okay, now he's okay to return. The doctor's note says nothing at all about any of these strange statements that he had made in words with friends. There's no indication the doctor even knew about those statements that Mr. Heller had made. So what did the district do? Did it bring charges against him? No. The district used its right under Section 913 of the New York Education Law to send him to a psychiatrist so it could find out what's going on, to a neutral psychiatrist to get facts. And it was very patient with how much time it took for Mr. Heller to get his records to that psychiatrist. A couple of months went by. It continued his pay during this entire period of time. And then the psychiatrist issues a report in May of 2013 saying that Mr. Heller had failed to cooperate with the psychiatric examination, number one, had lied to the psychiatrist about many crucial facts, and number two, that as far as the psychiatrist can tell based on the examination, he has a very serious mental illness that's probably going to deteriorate very shortly. So on the basis of that, that's when the district took action. And the district brought charges against him. And even then, of course, there was no discharge. Under the law, the district had to go to a neutral hearing officer under Section 3028 of the Education Law. The hearing officer issued a very detailed opinion saying that the charges were upheld. This is after many days of hearing, many witnesses. Not a single witness, by the way, not a single medical witness on Mr. Heller's side in that hearing. And it was only after that that Mr. Heller was discharged. So there was no causal link between the speech and the district's action of discharging Mr. Heller. And we believe that that is really the key to this case. There are other issues as well. And the Brookie Bile case, of course, is right on point. It has to do with causation in a situation that's really very similar to this one. So I don't think that with regard to the district, the court even needs to reach any of these other issues. It's all based on causality. But when it comes to the other issues, the Pickering balancing is not premature. You could tell just on the facts that are undisputed in the record that this information became public, what Mr. Heller was saying in words with friends, and there's no reason to believe it could have stayed secret forever given how volatile it was and given how the police were involved. Would the school board have an obligation to disclose this to parents if they considered that Mr. Heller constituted a dangerous condition in the schools? Well, the district never had to make that decision because- I understand that. I'm just asking hypothetically. Hypothetically is the stuff that didn't happen. Yeah. Well, I guess you're making a good point. I hadn't thought of that. But, yes, I suppose if the district had lost the 3028 hearing- You're making the point. I'm just asking. Well, okay. Well, you're giving me an idea for a point then. If the district had lost the 3028 hearing, then perhaps the district would have been obliged to tell the parents about the situation with Mr. Heller. By the way, it also became a matter of public record when Mr. Heller appealed his 3028 decision to court. He made no effort to seal the proceedings there. It's a public record. Anyone could go into the records of the New York State Supreme Court for Westchester County. Anyone could go into the record for this court for that matter. So it is a matter of public record what Mr. Heller said. But if it were not a matter of public record, if parents didn't know on their own, it probably would have been a moral obligation by the district to inform parents that, look, we were forced to bring this guy back to school, but here's what you should know about him. But in any event, whether that's the case or not, under the Pickering test, there's a balancing. And I agree with Mr. Sussman that it's a dangerous doctrine to decide what's delusional and what's not. I don't think this court needs to rely on that doctrine. But under the Pickering balancing test, you need to balance the potential danger of disruption to the school by having this information out there on the one hand versus the right to free speech. And I think the balance there is very straightforward. I think it's delusional what Mr. Heller is claiming in this case, that everyone just would have said, oh, well, we don't care that Mr. Heller believes that he should be shooting guns out of the sky because of the occurring hurricanes and blizzards, and that Martians are controlling everyone's minds, and that the school shooting is 15 miles away in Connecticut. I think he said Martians control everybody's minds. Well, Martians are controlling at least some minds. They're controlling the government's minds is, I believe, what he was suggesting. But my point is that when it became public, as it I think inevitably would have, that these statements were made that would have disrupted the classes. Even though it's true, as Mr. Sussman said, there's no history of anything bad happening in his teaching to date, before he was taken out of class, before he was arrested. But still, it's hard to believe that parents and students would have just sat by there as if everything was fine, knowing that Mr. Heller had these beliefs and said these things, was buying guns at the same time that he was saying these things, and had that entire history. There's also, with regards to qualified immunity, I don't think we have to reach that issue since the whole case should be dismissed. But just the sheer fact that Judge Forrest below found qualified immunity, I think ipso facto shows that a reasonable layman could have reached the same decision. So it was not clearly established that Mr. Hockman did not have qualified immunity. There are other procedural issues on collateral estoppel. The issue there is whether the hearing officer had, as essential to his decision, his findings about there being no discrimination and about the intent of the school district. If you read the hearing officer's decision, he's not a lawyer, the hearing officer. It's not the most elegantly crafted decision. But one thing that's very clear about that hearing officer's decision is that he seemed to believe, and he threads it throughout his opinion, that it's very important to state that the district had pure motives throughout. That's the theme that he keeps on coming back to. He believed, at least, that it was essential to his decision. Thank you. We'll hear from the town. May it please the court, Stephen Stern for the town of Pound Ridge and Chief David Ryan. It's almost daily that I get an e-mail or a text message from my children's school with a notification to all parents indicating that there's a suspicious vehicle at one school or there's a suspicious person near another school. And in today's day and age, it is commonplace, and schools err on the side of caution in making sure that students are protected. I think that's Mr. Sessman's argument, that you erred. There's no error here, Your Honors. This was a situation where, whether or not there was an actual danger posed by this individual, it was certainly objectively reasonable for my client to take the precaution of bringing him to the hospital. When you say bringing him, did he bring him in handcuffs? No, Your Honor. He did consent. I understand Mr. Sessman makes the argument that it was a compelled consent, but there is actual testimony from Mr. Heller in this record at how easy it was to- What did he say? He said, what did Chief Ryan say? No, you said Mr. Heller commented on how easy. I don't remember the specific words, but he went along willingly to get checked at the hospital. This is not a situation where an individual is speaking out about wrongdoing by the government. This is speech that's reflective of not only delusion, but dangerous delusional thoughts. In early December, Mr. Heller buys a gun for the first time. In the middle of December, he buys a second one. On December 14th, the Sandy Hook tragedy happens. On December 15th, he's speculating that the military organ was involved in orchestrating it. On December 27th, he's stewing in anger because the wind, the snow, and Hurricane Sandy were created artificially. He's angry, he says. He wants to kill people because the people behind it are evil. He says to this friend of his on the Scrabble game that he could give her a list of all the people who deserve to die. He says someone could just shoot down the planes that spray chemicals through the sky. He talks about the shooters in these tragedies being contracted to do this as assets to the government. But he really talks about when he gets into it that this is really their minds being controlled or the government being controlled by aliens from outer space. He talks about personally having to deprogram himself because apparently the aliens are controlling his mind. And then when he discusses somebody making a list to remove them from power and she asks whether he would be the person to make that list, he tells her it's not a wise topic of conversation. He becomes evasive. It was imperative, it was incumbent upon the law enforcement officers to make sure that this didn't end in another tragedy. And whether or not he posed an actual danger and was really going to carry through with these things, that's not the standard for probable cause. And I... Well, you're talking about probable cause, but earlier you were saying that there was no arrest, that he went along. Well, he did go along, but... Police. To the... Probable cause for what? Regardless of whether or not he consented, there was probable cause to take him into the hospital for evaluation and treatment. And there's a dispute as to whether he consented. There is a dispute as to whether he consented. But regardless of that, there was probable cause. But even taking the lower standard, and as your honors know, the qualified immunity analysis is to be decided at the earliest possible opportunity, there was at a minimum arguable probable cause to have him evaluated. And the Supreme Court in the Mullenix and Sheehan cases have recently, if anything, strengthened the entitlement of law enforcement officers to qualified immunity and narrowed the degree of specificity with which the question is framed. And there's no cases here that put the officers clearly on notice, or put Chief Ryan clearly on notice, that his, as Mr. Sussman calls it, mental health arrest, but taking Mr. Heller to the hospital would be a violation of his constitutional rights. The standard under substantive due process is a lower standard even than under the Fourth Amendment, and I submit that given the record, and it's a record that your honor, that Judge Forrest considered, because it was incorporated into the complaint by reference, if you consider that in connection with the complaint, the court could easily and should easily conclude that the district court was correct, that this was not conscience shocking to detain this individual to make sure that he didn't pose a threat and that he was mentally fit to return to society. Mr. Sussman makes a comparison from this case to others and argues that Mr. Heller was engaging in hyperbole. Hyperbole is obvious and intentional exaggeration. This was not exaggeration. This was speech that was indicative of mental illness. This was speech that was arguably dangerous, and this was speech, as a result, that constituted a true threat. And the cases that Mr. Sussman cited in his brief are cases that dealt with an interpretation of criminal statutes imposing We have applied that statute in a civil context. And he's talking about a threat that's like right now against this person standing right there smoking that cigar. But in this case, there was a threat. It may not have been directed at a specific individual, but it was a threat. I mean, the Sandy Hook shooter may not have spoken that he was going to directly threaten a particular individual at a school. There's no question that the Sandy Hook shooter was crazy and dangerous. The question is what there is here that amounts to a true threat under the definition that we unwisely have applied in the civil context. But we have. It has to be against – it has to be right now and against a particular person. It can't just be somebody has a gun and has wacky ideas. When you – the context of the situations are highly distinguishable. In here, we're talking about applying it to a school setting, taking precautions to make sure that an individual – bringing charges against an individual to give him due process to prove whether or not he is fit to return to duty. In a criminal case, you're talking about punishing somebody criminally for their speech. This is not punishment we're talking about. This is to preserve the safety and security in the school setting. And in the context of – I'm just saying we have taken that standard and applied it in the civil context. And you're saying that was probably unwise, and I might agree with you, but we have. Your Honor, I believe you can distinguish it and should distinguish it here. Okay. Thank you. We'll hear from Rebecca. There's a lot to say, so I'll try to be fast. First of all, the district here was in this from the very beginning. Counsel gets up and says they weren't. That's not true. What happened is very clear. There were meetings between – and it's all set forth in our complaint. There were meetings between the police chief – and this goes to qualified immunity also – the FBI, Mr. Hochman, the school superintendent. At those meetings, the FBI was asked to do an arrest. The state police were also there. Arrest this man. There's no basis for an arrest. But was there an arrest? Because Mr. Heller said that when he was – when the police chief suggested or asked him to go to the hospital, the police said, I don't have any problem. If you want me to, I'll go. Mr. – that's one version of events. The other version of events is that the police chief – What your client swore to. The police chief stated to Mr. Heller, you're either going with me before that or you're going anyway. That was the context. There were nine police officers in his living room. That was the context we're dealing with. So it was a highly coercive situation. But I'm trying to get to the point before that, which is qualified immunity here. The reasoning, the basis. You heard earlier that there was at least a 10-day delay between when this gentleman – they found out about what this gentleman said. If they ever found out the real content of it, that's a whole other question. They found out the content of what he said and when they did anything. This is the 8th to the 18th. In that period of time, they're having all these meetings. They're doing nothing. He's going to school and teaching. He's doing nothing aberrant or anomalous in the class. What's wrong with the school district doing that? You're acting like the school district is conspiring with the FBI. The school district did one thing that harmed your client, and that was done after, as was set out, after there was a finding, which was appealed to a hearing officer, that he had not cooperated under Section 913. Respectfully not true. They didn't do one thing. This is what happened. The school district got a report from the facility, which everyone agreed he would go to for the psychiatric evaluation. He goes to the psychiatric evaluation. He spends about 10 days in a psych unit. The psych unit clears him. The doctor in charge of the unit, after the panel met to clear him, sends a letter saying he's fit to resume work. They don't accept that. They don't contact the doctor. And most critically – and this, I think, is what's been missed – the school superintendent writes an email back to the police chief. This is Ripley's believe it or not. Can you believe this? And when I asked specifically at the proceeding, what are you really talking about, what the school superintendent said was, there's no way in the world we were letting that man back into school whether he was cleared or not. And the reason for that was the content of his speech and the fact that he purchased guns, which were two lawful activities. That's at the heart of the case, and that's why the complaint should be sustained. It is perfectly plausible, given what happened here, to understand the school district from the very beginning as never going to allow Heller back into that building. And the reason for that is not his mental unfitness because he was cleared. Can I ask you this hypothetical? Sure. You're in charge. Let's say that Mr. Heller went berserk and did shoot a couple kids in the school. Do you think that the parents of those children would have a sound, even valuable, tort claim for negligence? No, I don't. You don't? I don't. Because what Mr. Heller engaged in was the same kind of speech that, fortunately or unfortunately, millions of Americans engage in who've lost faith in our system. And a lot of those people have guns. And a lot of those people, frankly, have very right-wing views, which, as you know, I don't have. They don't trust the government, and they have guns. And their teachers, some of them, and their accountants and their lawyers and their doctors, and they're all over our society. And one of the persons, frankly, who's running for president is running based on their anger. And we can't have a society. I don't agree with any of them. I don't agree. I don't think we should have guns in our society, frankly. We do. I don't agree with any of their rhetoric. But the fact is, I'm trying to answer you because I think it's an important question. I think it's the reason this case is so important, respectfully. Yes, it is. Because we don't have a society with litmus tests, and we don't have a society based on 1984 here. And you can always say about someone, and I see it in my law practice every day in Orange County, there are plenty of people living in this kind of a way. And no, it's not enough. Because you set the standard in Selvey, and you refer to it repeatedly in your questioning. There has to be a more direct basis before the government can take action of the sort taken here. The police chief had no basis. He did not. He was in Mr. Heller's presence, and he recognized, as he testified, that Mr. Heller was articulate, was clear, showed absolutely no signs of anything, and was cooperative. Mr. Heller wasn't acting as an off-the-wall person. He'd just come from teaching that day. He was a perfectly rational person. No, but, I mean, it's important to get the picture. He's a perfectly rational person who has views. Maybe he has views. He says he explains it. He explores a lot of views. He explores a lot of things, which is part of what our society is based upon, that ability. So I thank you for the extra time. I commend the case to you because I think it's a case of great importance, and I don't think it should be based upon statements that the school district didn't do anything. The school district did a lot before the final act. They made a conclusion, which the complaint plausibly pleads, that this man was never coming back to teach here again, and that's expressed in the Ripley Believe It or Not statement. Thank you. Thank you all. We will reserve decision.